**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

June Williams,
Plaintiff,

**Memorandum Order & Opinion**
Civil No. 00-2256 (MJD/SRN)

v.

The Thomson Corporation,
Thomson Publishing Corporation,
West Publishing Company, d/b/a
West Legal Publishing d/b/a West Group,
Brian Hall, Andrew Prozes, Timothy J. Blank,
Jeannine Beiter, Lea Harpster a/k/a Lea Walstrom,
Kevin Appold, Kay Engler and Kirk Emmen,

Defendants.

William D. Bell, Sr., for and on behalf of the Plaintiff.

Patricia A. Bloodgood, and Susan E. Ellingstad, Lockridge Grindal Nauen, P.L.L.P, for and on behalf of Defendant.

This matter is before the Court upon Defendants' Motion for Summary Judgment. For the reasons set forth below, Defendants' motion is GRANTED.

## BACKGROUND

Plaintiff June Williams ("Williams") was employed by West Publishing, now West Group, as a Reference Attorney from May 2, 1994 until February 4, 1998. On July 31, 1998, she filed an administrative complaint with the Office of Federal Contract Compliance Programs ("OFCCP"), a division of the Department of Labor. In her Complaint, Williams alleged that West Group had discriminated against her on the basis of race, sex, religion and disability. The

FILED 3-31-03
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. 3-31-03
DEPUTY CLERK

OFCCP transferred this complaint to the Milwaukee Office of the EEOC. The EEOC investigated the claims and issued a Dismissal and Right to Sue Letter on June 17, 1999. This action was filed in the United States District Court, District of Ohio on October 21, 1999. The case was later transferred to this District upon the Defendants' motion. (Order dated 09/29/2000).

On August 13, 2001, this Court granted dismissal of multiple counts alleged in Plaintiff's Amended Complaint: Count 5, Breach of Covenant of Good Faith and Fair Dealing; Count 6, Interference with Contract; Count 7, Negligent Hiring and Retention; Count 10, Age Discrimination; Count 13, Negligent Supervision; Count 14, Minnesota Human Rights Act; Count 15, Disability Discrimination and Count 18, Battery. Further, Count 2, Title VII and Count Eleven, ADA, were dismissed as to the individual defendants and Count 4, Breach of Employment Contract was dismissed as to the punitive damages claim. Thompson Publishing was also dismissed as a party to the case. (Order dated 8/13/01).

Before the Court is Defendant West Group's motion for summary judgment on William's remaining claims. On December 13, 2002, oral arguments were heard on the summary judgment motion and on West Group's Motion to Strike Plaintiff's Affidavit in Opposition to Defendants' Motion for Summary Judgment. The affidavit was served on Defendant on November 13, 2002, the same date that Defendants' reply brief was due. The untimely affidavit was a continuation of Plaintiff's pattern of late filings in this action. Accordingly, the Court granted the Defendants' motion to strike the affidavit.

## FACTUAL BACKGROUND

Williams was employed as a reference attorney in the Westlaw division of West Group from 1994 to 1998. (Williams Dep. at 60; Blank Aff. ¶3). Reference attorneys are available twenty–four hours a day, seven days per week to assist customers with questions about formulating their research queries on Westlaw. (Blank Aff. ¶4). Reference attorneys are directly supervised by a team coordinator. Williams' team coordinators during her employment, were Kay Engler, Kirk Emmen, Tammie Follet, Sharon McIlquham, and Kevin Appold. (Williams Dep. at 445-48). The managers above the team coordinators during Williams' employment were Brad Fisher and Lea Harpster. Fisher and Harpster both reported to Jeannine Bieter. (Id. at 446-51). The record reflects that throughout her tenure at West Group, Williams regularly advanced complaints of discrimination and harassment based on religion, race, sex, and disability.

Williams alleges that she was discriminated against on the basis of religion and that West Group failed to accommodate her religious observance and practice. When she began her employment with West Group in 1994, she was scheduled to work on Sundays. At her request, she did not have to work on Sunday mornings. She states, however, that her supervisors hindered her attempts to trade shifts in order to attend church commitments and deliberately manipulated her work schedule. Further, she claims that she was scheduled on Sunday afternoons, which made it difficult for her to attend to her church activities and arrive at work on time. (Williams Dep. at 191-201). Williams also states that she was not allowed to participate in a West Group theater production because she had to miss a rehearsal due to her participation in an Ash Wednesday service. (Id. at 131-135). In addition, she states that when she attended her

supervisor Kevin Appold's wedding, his father, a Lutheran clergyman, seemed hostile to the fact that she was an Episcopalian. (Id. at 191-192, 296-297).

Williams also claims that she was discriminated against and harassed at West Group because she was a female. In particular, she states that in 1996 a computer technology employee was hostile to her by insisting on fixing rather than replacing her computer monitor and by giving her orders. (Id. at 253-254). West Group spoke to the employee and his department regarding how to treat employees. (Ellingstad Aff., Ex. 51). Williams alleges that in 1994 she was harassed while working for West Group at the Minnesota State Fair grounds. A man attending the fair came close to the booth and she felt "pressure upon her posterior." (Williams Dep. at 213). Further, Williams contends that callers sexually harassed her. She cites two callers in particular. One, she states, "would not allow me to speak. He would not listen to what I had to say. He would not answer responsively to questions that were put to him to identify what he claimed to have right in front of him." (Id. at 207). She also describes a caller from Missouri who would keep her on the phone for extended periods of time. (Id. at 209). Further, she claims that an employee, Tom Baxter was hostile and at one point accosted her in the hallway. (Id. at 182). West Group spoke to Baxter regarding the incident and instructed him to review West Group's harassment policy. (Ellingstad Aff., Ex. 54).

The following facts are relevant to Williams' race discrimination and harassment claims. The record indicates that by September of 1994, West Group had received five complaints from customers that Williams had been rude, impatient and abrupt. (Ellingstad Aff., Ex. 3). In response, Williams' supervisors notified her of the problem. They suggested ways she could improve her customer service and suggested that she take a seminar on dealing with difficult

people. Id. They also suggested that she transfer calls to team coordinators when she had difficulty with a caller. (Id. at Ex. 4; Williams Dep. at 203-204). In response, Williams wrote a memorandum to Jeannine Bieter and Lew Freeman of Human Resources. In her memorandum she described her experience with callers, one of whom she referred to as a bigot. She also accused West of discriminating against her based on race. (Id., Ex. 5). Bieter and Freeman met with Williams to discuss her concerns. (Id., Ex. 6). Williams stated that she "just knew" the callers were racist. Id. On October 24, 2994, Freeman wrote a response to Williams' allegations and requests from her memorandum. (Id. Ex. 6). West also changed Williams' supervisors from Kay Engler to Kirk Emmen upon her request (Williams Dep. at 447-448). Thereafter, Williams alleged that she was discriminated against and harassed by her co-workers, supervisors and callers. (See Ellingstad Aff., Exs. 10, 41-48).

Williams' deposition testimony also discusses general hostility from a co-worker, Jean Wassner in 1994. (Williams Dep. at 221-224). Further, she states that she was not recommended for a photo shoot in which West Group wanted an African American in the photo because a West Group employee felt that she was not dark enough. (Id. 130-131). Williams further points to what she perceived as racial harassment by a co-worker, Kelly Bruns, who discussed the O.J. Simpson verdict with her on the day of the verdict. Williams states that the co-worker targeted her as an African American to vent her frustrations with the verdict (Id. at 182-183). In response to Williams' problems with Bruns, West Group moved Williams' cubicle upon her request. (Id. at 184-185). Williams also reports an incident involving a security guard who interrogated her on two occasions and asked to look at her badge. West Group later

terminated the guard, (Goodson Aff. ¶3; Ex. A), and the head of the security department issued Williams' an apology letter. (Williams Dep. at. 146-48).

Williams states that she was targeted for termination following her complaint about a caller who challenged her regarding the facts of the Kenneth Clark race studies. Williams claims that after the incident, she received a poor performance evaluation and suggests that West Group's performance evaluations were changed to emphasize areas in which she did not excel at the expense of areas where she did excel. (Id. at 119-120).

Williams also complained that West Group racially discriminated against her in 1996 by not selecting her as a delegate to the National Bar Association Convention. (Ellingstad Aff., Ex. 11). West Group indicates that when Williams asked, she was allowed to go at West Group's expense. Williams complained when West Group expected her to put her expenses on her credit card and submit them to West Group for reimbursement. She alleged that this was discriminatory because the other delegate to the conference knew in advance that West Group expected her to charge the cost of the hotel room. (Id., Ex. 11, Williams Dep. at 167-68). When Williams called from the conference to complain regarding putting the charges on her personal credit card, West arranged with the hotel to pay for the room. (Williams Dep. at 167-169).

**Unlicensed Practice of Law**

From 1994, Williams asserted that her job duties constituted the unlicensed practice of law. (Id. at 426-32, See, e.g., Ellingstad Aff., Ex. 7,8). In response, West Group obtained a legal opinion from a Minnesota law firm on the issue. That opinion stated that under Minnesota law the work performed by the reference attorneys did not constitute rendering legal advice. (Blank Aff. ¶5; Williams Dep. at 262; Ellingstad Aff., Ex. 25). West Group then retained a second law

firm from New York to issue an opinion the issue. (Blank Aff. ¶6). West Group informed Williams that the New York law firm also determined that formulating queries for West Group customers was not the unauthorized practice of law. (Id. ¶ 7; Williams Dep. at 262; Ellingstad Aff., Ex. 25). Williams indicates that she did not receive a copy of the opinions. (Williams Dep. at 262; See Ellingstad Aff., Ex. 25). West Group instructed Williams to transfer calls to management when she felt that "a customer's behavior, comments or questions may be inappropriate and management intervention is necessary." (Ellingstad Aff., Ex. 51, ¶11).

**Performance Review**

In November 1994, Williams had her first performance review. Williams received an "achieving expectations" rating but received a "below expectations" rating for service commitment. (Id., Ex. 9). By the time of her performance review, West had received seven formal complaints from customers. (Id). Williams disputed the criticism of her handling of customer calls. Williams responded with a memorandum disputing the findings of the evaluation and claimed that the situation was, "a continuation of the same hostile negative pre-judgments complete with the articulable [sic] biases, negative mind-set and predispositions that are unlikely to be resolved in an environment where diversity at all levels is not a daily fact of life." (Id., Ex. 10). In addition to the specific alleged discriminatory incidents, described above, Williams alleged institutionalized racism and discrimination. (See, e.g., Id., Exs. 41-48). West Group responded to the complaints through meetings and memoranda addressing Williams concerns with callers and proscribing measures for dealing with difficult callers, responded to Williams' discrimination claims, and described their reasons for her performance evaluations. (See, e.g., Id., Exs. 4,6,7,12,22,49-52, 56-59).

**Mediation**

West Group engaged in two mediation sessions in an attempt to resolve Williams' concerns. Tim Blank, the Vice President of Human Resources, together with Jeannine Bieter, and Brad Fisher and Williams participated in five two-hour mediation sessions between March and May 1997. West Group paid for the mediation sessions except for $100 which Williams asked to pay. (Williams Dep. at 548-50). West Group discontinued the mediation because it saw no progress in resolving Williams' complaints. (See id, Ex. 12).

**Termination**

In 1996 Williams suffered from carpel tunnel syndrome. The events surrounding West Group's accommodation of her carpel tunnel are the basis of her ADA claim. In 1996, Williams was restricted to four hours of data entry per day due to discomfort in her forearms caused by carpel tunnel syndrome. (See id., Ex.2). Data entry or "keying" is required as a part of a reference attorney position. At West Group, reference attorneys were expected to receive calls from customers for approximately 7.75 hours per day. (Williams Dep. at 55; Ellingstad Aff., Ex. 17). Due to restrictions on her keying, Williams took calls between zero and four hours per day for the remainder of 1996 and all of 1997. (See id., Ex. 17). West Group consulted a work site expert to make adjustments to Williams' work area, which included modifying her workspace and offering different equipment. (Id., Ex. 18). Williams was asked to work on other assignments during the time she was not able to take calls from customers. (Williams Dep. at 159-50; Ellingstad Aff., Ex. 18). During that period, Williams had what West Group claims was an excessive number of absences from work in 1996 and 1997. In particular,

Williams took 40 sick days in 1996 and 29 sick days in 1997. (See id., Exs. 15, 16). West Group's company goal is five sick days per year. (Id., Ex. 16).

In November of 1997, Williams' workers compensation claim had closed. (Id., Ex. 18). On November 24, 1997, Lea Harpster and Jeannine Bieter informed Williams that based on her physician's recommendation, she was expected to key four to five and one-half hours per day with the rest of her work day spent on assigned tasks. Id. They instructed Williams to provide a doctor's note to support future absences. Id.

Williams responded with an email accusing West Group of harassment. She stated that she would determine how much work she would do each day and if she were in pain, she would not perform any duties. (Id., Ex. 19). On November 25, Williams met with Tim Blank and sent him a memo dated November 26, 2997. In the memorandum she claimed that West Group was responsible for "bullying and harassment." She also stated that she would determine the projects she would work on, "should I get to the point where I am looking for additional projects to keep occupied if I am not on the phone." (Id., Ex. 20). Blank responded by reminding Williams of her job duties, directed her to communicate with her managers in a cordial, cooperative, and professional manner, and that communications like her email would be viewed as insubordination. (Id., Ex.12).

During this time, Jeff Henry of West Group's Human Resources department confirmed with Ms. Williams' physician that Williams' was able to key between four and five and one-half hours per day. (Id., Ex. 21). On December 22, Williams informed Kevin Appold that she needed time to stretch before work. Lea Harpster reminded Williams that she needed to work an eight-hour day, but that West Group would work with her and her physician by altering her start

time, to accommodate her doctor's instructions. (Id. Ex. 22). During this period, Williams responded to communications with her supervisors through memoranda to West Group's management, which West Group perceived as insubordinate. (See id., Exs. 23, 24).

Williams was absent from work from January 5, 1998 through January 9, 1998. Lea Harpster, in response to Williams' accusation that she was being harassed by West Group's request for a doctor's note, explained that West Group always requires a doctor's note from employees with attendance problems. Harpster informed Williams that the nature and tone of her communications to her managers was inappropriate. (Id., Ex. 26). Williams responded to both Harpster and Bieter through emails and memoranda regarding West Group's treatment of her and her condition. In her communications she explained, in part, the burdens of her condition, that West Group was hostile in accommodating her, that she was being harassed regarding doctors notes, and that she would not work if it felt it jeopardized her health. She also defended her performance at work (See id., Ex. 26, 27).

On January 16, 1998, Williams' physician sent West Group a fax with work restrictions of "4-5 hours a day as tolerated." Kim Austvold, a West Human Resources manager, asked Williams' physician to clarify whether she meant 4 to 5 hours of "keying" as tolerated or "working" as tolerated. (Id., Ex. 28). When she did not receive a response from the physician, Austvold wrote another letter on January 21, 1998, stating that Williams interpreted the restrictions as allowing her to perform only as much keying as she felt comfortable, whether one hour or four hours. The physician responded on January 22, 1998, stating that Williams could work eight hours a day as long as her keying was limited to between four and five hours a day. Id.

On January 28, 1997, Harpster told Williams that West Group received clarification of her work restrictions from her physician and, therefore, West Group expected her to conduct phone and keying between four and five hours per day, with the remainder of the eight-hour workday spent completing assigned tasks that did not require keying. (Id., Ex. 29). That day, Williams emailed a letter to Bieter. In the letter she claimed that West Group personnel was unhelpful and was aggravating her condition. She also accused West Group of institutionalized racism. (Id., Ex. 30). The following day, January 29, 1998, Williams informed West Group that because of increased pain she would not take on a new project, but instead would clean out her cube. She stated that she needed the time that was not spent keying to recover from pain and fatigue. (Id., Ex. 31). On January 30, 1997 Kevin Appold instructed Williams to work on the project during the hours that she was not keying. Williams refused. (Id., Ex. 32). On February 2, 1998, Kevin Appold left Williams a project to begin. Williams responded that the assignment was not acceptable and asked that West Group compensate her for time spent outside of work for work-related conditioning. Williams accused West Group of being uncooperative and engaging in "a guerilla tactic" (Id., Ex. 33).

West Group terminated Williams' employment on February 2, 1998 due to what it cites as acts of insubordination, inappropriate conduct and failure to consistently appear for and perform the responsibilities of her job. (Id., Ex. 62).

**STANDARD OF REVIEW**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the burden of bringing forward sufficient

evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celeotex Corp, 477 U.S. at 322. The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Casualty & Surety Co. , 612 F.2d 1076, 1077 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, rather, they must by affidavits, "depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(2); Celeotex Corp., 477 U.S. at 324; United States v. Crane Co., 122 F.3d 559, 562 (8th Cir. 1997), cert.denied, 523 U.S. 1040, 118 S.Ct. 1336, 140 L. Ed.2d 498 (1998); McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 511 (8th Cir. 1995). Further, if a party cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. See Celeotex Corp, 477 U.S. at 322-323, 106 S.Ct. 2548.

The Court is mindful that "summary judgment " should seldom be used in employment discrimination cases." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citing Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir. 1991); Hillebrand v. M-Tron Indus., Inc., 827 F.2d 363, 364 (8th Cir. 1987), cert. denied, 488 U.S. 1004, 109 S.Ct. 782, 102 L. Ed.2d 774 (1989). However, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases. . . the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." Landon v. Northwest Airlines, Inc., 72 F.3d 620, 624 (8th Cir. 1995)(internal citations omitted).

## DISCUSSION

### I. Timeliness

West Group argues that it is due summary judgment on Williams' claims. In particular, they assert that the Title VII and ADA discrimination claims are time-barred for Williams' failure to file a civil complaint within ninety days after receiving a right to sue notice from the EEOC. 42 U.S.C. §2000e-5(f)(1); 42 U.S.C. §12117(a). "Normally it may be assumed, in the absence of challenge, that a notice provided by a government agency has been mailed on the date shown on the notice." Sherlock v. Montefiore Medical Ctr., 84 F.3d 522, 526 (2d Cir. 1996). See also Baldwin County welcome Center v. Brown, 466 U.S. 147, 148 n.1 (1984)(per curiam). Further, a presumption exists that an EEOC notice is received three days after mailing. Sherlock, 84 F.3d at 525; Kerr v. Charles F. Vatterott & Co., 184 F.3d 938, 947 (8th Cir. 1999).

In this case, the record indicates that the EEOC sent Williams a Dismissal and Notice of Right to Sue to the Eagan, Minnesota address she had provided. (Ellingstad Aff., Ex. 35). The notice stated that the EEOC had found "no evidence showing how [Williams'] race, sex, religion and age were factors considered in the alleged discriminatory treatment [she] received from [West Group]." (Id., Ex. 35). The letter stated that Williams had a right to file a rebuttal to its finding on or before May 17, 1999 and that if, after reviewing the rebuttal, the agency still could not find a violation, it would issue a Dismissal and Notice of Right to Sue Letter. Id. Referencing her receipt of the May 7, 1999 letter, Williams sent a rebuttal letter to the EEOC on May 23, 1999. (Id., Ex. 36.) Ms. Williams then moved from Minnesota to Ohio the first week of June to begin a new job on June 7, 1999. (Id., Ex. 37). Williams did not notify the EEOC of her new address until July 7, 1999.

The EEOC mailed the Dismissal and Notice of Right to Sue letter to Williams' Minnesota address on June 17, 1999. On July 9, 1999, the Minnesota post office forwarded the dismissal notice to Ms. Williams' new address. Presuming the notice arrived three days later, Williams would have received the notice on July 12, 1999. Williams did not file her suit until October 21, 1999. In short, she filed her suit in federal court after the 90-day deadline whether viewed under either the June 17, 1999 or the July 12, 1999 receipt date. Williams argue that that she did not receive the letter until July 23, 1999 because she was "away on commission business" until July 23, 1999. (Am. Compl., ¶ 4, Williams Dep. at 419-420). Even viewed in the light most favorable to Williams, the fact that she did not open her mail until July 23, 1999, does not mean that she did not receive the letter on July 12, 1999.

The Court also finds that the facts before it do not warrant equitable tolling of the 90-day period. See Baldwin County, 466 U.S. at 151 (holding that plaintiff "who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence"). Nor does Williams suggest that equitable tolling is due other than to state that she was late in opening her mail because she was not at home. The inconvenience Williams suggests is insufficient to warrant the equitable tolling of the 90-day period. Equitable tolling is reserved for circumstances that are "truly beyond the control of the plaintiff." Hill v. John Chezik Imports, 869 F.2d 1122, 1124 (8th Cir. 1989); it is "appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands." Lown v. Brimeyer, 956 F.2d 780, 782 (8th Cir. 1992), cert denied, 560 U.S. 860, 113 S.Ct. 176, 121 L. Ed. 2d 122 (1992). The Court further notes that filing deadlines should not be considered lightly by the courts. The Eighth Circuit has stated that the "[p]rocedural requirements established by Congress for gaining access to the federal courts are

not to be disregarded by courts out of a vague sympathy for particular litigants.'" Shempert v. Harwick Chem. Corp., 151 F.3d 793, 797 (8th Cir. 1998).

Without citing the record, Williams argues that this matter has already been considered and rejected by the federal district court in Ohio. Rather, a review of the record indicates that the federal district court decided to transfer venue and did not address the case otherwise. (Order dated 9/29/2000; Report and Recommendation dated 5/19/2000). Based on the foregoing, the Court concludes that Williams' Title VII and ADA discrimination claims are time-barred and therefore dismissed.

## II. Count I: Denial of Promotion and Advancement; Count Three: § 1981

Williams alleges that West Group racially discriminated against her in violation of 42 U.S.C. §1981, resulting in failure to promote and eventual termination. (Am. Compl. ¶34-41). Williams further argues that due to racial harassment, she suffered from a hostile work environment at West Group. Section 1981 prohibits racial discrimination in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. at §1981(b). As a general rule, courts apply the same standards for §1981 and Title VII claims. See Ross v. Kan. City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002); Cronquist v. City of Minneapolis, 237 F.3d 920, 926 (8th Cir. 2001).

As here, where a plaintiff relies on circumstantial rather than direct evidence of intentional discrimination, the Court applies the burden shifting analysis of McDonnell Douglas v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas test, the plaintiff bears the initial burden of

presenting a prima facie case of discrimination. Dammen, 236 F.3d at 980. Once the plaintiff establishes a prima facie case, the defendant has the burden of production to offer legitimate, nondiscriminatory reasons for the action. The plaintiff must then provide sufficient evidence for the trier of fact to infer that the employer's proffered legitimate nondiscriminatory reason is not only false, but that it is pretext for discrimination. Reeves, 530 U.S. at 141.

This is accomplished by proving that the discrimination "actually played a role in [the employer's decision making] process and had a determinative influence on the outcome." Id. (internal citations omitted). Further, a plaintiff may "avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that [the protected category] was a determinative factor in the adverse employment decision. Rothmeier v. Inv. Advisers, Inc., 85 F.3d 1328, 1336-37 (8th Cir. 1996). The plaintiff retains the burden at all times of proving that the employer's conduct was motivated by unlawful discrimination. Reeves, 530 U.S. at 141. If the prima facie case is established, a legal presumption arises that the employer unlawfully discriminated against the plaintiff. Id. This rebuttable presumption shifts the burden to the employer to produce evidence that the plaintiff was rejected for a "legitimate, nondiscriminatory reason." Id. If the employer articulates such a reason, the presumption disappears and the sole remaining issue is whether the employer discriminated. Id. The plaintiff then has an opportunity to prove, by a preponderance of the evidence, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id.

**1.) Failure to Promote and Wrongful Termination**

Williams claims that West's 1997 refusal to promote and February 1998 decision to terminate her employment were the result of racial discrimination in violation of §1981. In order to establish a prima facie case of race discrimination under §1981, a plaintiff must demonstrate that (1) she is a member of a protected group, (2) that she was performing her job at a level that met her employer's expectations, (3) that she suffered an adverse employment action, and (4) that facts exist which permit an inference of discrimination. Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 258 (8th Cir. 1996). The Court finds that Williams has presented insufficient evidence to suggest that West Group's promotion and termination decisions were based on race.

First, although Williams has satisfied prongs one and three of a prima facie case, she has not demonstrated that she was performing her job at a level that met her employer's expectations. Rather, the record is replete with complaints from callers and warnings from Williams' supervisors commencing from her employment at West Group in 1994 until her termination in 1998. In addition, the record indicates that near the time of Williams' termination, she was frequently absent and refused to engage in work that was permissible under her physician's instructions.

Regarding the fourth prong, Williams presents insufficient evidence to supply an inference of improper motivation. In particular, the alleged discriminatory conduct is charged against individuals who were not involved in her termination decision. The Eighth Circuit has, "carefully distinguished between comments which demonstrate a discriminatory animus in the decisional process. . . from stray remarks in the work place, statements by nondecisionmakers,

or statements by decisionmakers unrelated to the decisional process." Mohr v. Dustrol, Inc., 306 F.3d 636, 640-41 (8th Cir. 2002).

Williams does offer allegations of disparate treatment in support of the fourth prong, but has not shown that the comparison employees were similarly situated to her. "The test for whether employees are similarly situated to warrant a comparison to the plaintiff is 'rigorous.'" Id. (quoting Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994). Williams asserts in her Complaint that a white male reference attorney, Steve Mundt, was compensated more than she was for equal work. However, West Group has presented evidence on the record that Williams actually earned more than Mundt until January 1998, one month prior to her termination. (Ellingstad Aff. Ex. 61). At that time, Mundt received a 4.5 percent raise while Williams received a two percent raise. Id. West Group provides that it issues raises based on employee performance. (Blank Aff.¶ 8). As a result of Williams' attendance issues, refusal to perform, and failure to work an eight-hour day, Munt received a higher performance rating than Williams resulting in his earning $420 more a year than Williams. (Ellingstad Aff. ¶62, 61). Williams does not dispute West's legitimate, non-discriminatory reasons for the difference between her and Mundt's compensation.

Further, Williams argues that white employees with disabilities were treated differently regarding accommodations. However, she has not pointed to facts on the record, which would indicate either that these employees were similarly situated to her or that they were treated differently than her. Rose-Matson v. NME Hosps., Inc., 133 F.3d 1104, 1109(8th Cir. 1998)("unsubstantiated and conclusory allegations" of differential treatment are insufficient to support an inference of pretext because the plaintiff "points to no specific factual evidence

supporting her claim…"). Further, West Group has put forth evidence demonstrating that other individuals with medical concerns were not similarly situated to Williams. (Harpster Aff. ¶ 2-6). Thus, Williams has not carried her burden of establishing a prima facie case under §1981.

Even assuming Williams had established a prima facie case of race discrimination, West Group has presented legitimate, non-discriminatory reasons for not advancing Williams and for terminating her employment. The burden of production has therefore shifted to Williams. In response, Williams has offered no additional evidence on the record establishing that the reasons offered by West Group were pretextual. As such, Williams' race discrimination claim under §1981 is dismissed as a matter of law.

**2.) Hostile Work Environment**

Williams alleges a hostile work environment claim against West Group pursuant to §1981. She alleges that "the acts and omissions of defendant and the acts of defendant's employees not corrected by defendant constituted racial harassment of plaintiff during the course of her employment and interfered with plaintiff's enjoyment of the terms, conditions, privileges, and benefits of her contractual relationship with defendant." (Am. Comp. ¶36).

A hostile work environment occurs when the workplace is permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1994). In order to establish a prima facie case of hostile work environment against an employer, a plaintiff must show that (1) she is a member of a protected class; (2) unwelcome harassment occurred; (3) a causal nexus existed between the harassment and her protected-class status; and (4) the harassment affected a term, condition, or

privilege of employment. Bradley v. Widnall, 232 F.3d 626, 631 (8th Cir. 2000). In order to constitute an illegal hostile work environment, the conduct complained of must be "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." Harris, 510 U.S. at 21. Further, the plaintiff must demonstrate that the employer knew or should have known about the harassment but "failed to take prompt and effective remedial action." See Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999). In order to determine whether there is sufficient evidence from which a jury could find an objectively hostile or abusive work environment, the district court must consider all of the circumstances, including the presence or absence of other people, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23; Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999). Thus, the Supreme Court has determined that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Breden, 532 U.S. 268, 121 S.Ct. at 1510 (2001) (quoting Faragher, 524 U.S. at 788, 118 S.Ct. 2275); See also Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 573 (8th Cir. 1997).

First, the Court finds that the incidents Williams cites are insufficient as alleged to suggest they were motivated by racial animus. "A plaintiff's subjective belief or speculation that neutral statements are discriminatory does not establish a claim of hostile work environment." See Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000); Bradley v. Widnall, 232 F.3d 626, 632 (8th Cir. 2000). As such, Williams has not demonstrated that the

alleged harassment was directed at her due to her membership in a protected class. Further, she is unable to indicate that the alleged harassment was severe and pervasive. A plaintiff asserting a hostile work environment claim must be able to show that her work environment was so ripe with "discriminatory intimidation, ridicule and insult" that it effectively altered an employment condition and created an abusive work environment. Harris, 510 U.S. at 21. Even when viewed in a light most favorable to Williams, the Court finds that the incidents Williams cites are neither severe nor pervasive enough to sustain a hostile work environment claim. See Griffin v. Pinkerton's, Inc., 173 F.3d 661, 664 (8th Cir. 1999), Cram v. Lamson & Sessions Co., 49 F.3d 466, 474-75 (8th Cir. 1995), Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981).

**III. Count Eight: Equal Pay Act**

Williams alleges that West Group violated the Equal Pay Act by paying women and African Americans less than their white colleagues. (Am. Compl. ¶70). In order to sustain a claim under the EPA, 29 U.S.C.§206(d), a plaintiff must show that: (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs that require equal skill, effort and responsibility; and (3.) the jobs are performed under similar working conditions. Sowell, v. Alumina Ceramics, Inc., 251 F.3d 678, 683 (8th Cir. 2001); Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974). Williams also must demonstrate that West Group paid her less than another for equal work in positions that required equal skill, effort and responsibility. Beuttner v. Arch Coal Sales Co., 216 F.3d 707, (8th Cir. 2000). An employer may rebut a prima facie case by showing that it based the wages paid on one of the following nondiscriminatory factors: a senior system; a merit system; a system that measures earnings by quantity or quality of production; or a bona fide business reason, other than sex.

Sowell, 251 F.3d at 683; 29 U.S.C.§206(d)(1). Unlike the McDonnell Douglas framework, a defendant to an EPA claim must prove that the pay differential was based on a factor other than sex. County of Washington v. Gunther, 452 U.S. 161, 170, 101S.Ct. 2242, 68 L.Ed.2d 751 (1981). As previously discussed, Williams bases her EPA claim on a comparison with Mundt, a white male. West Group has offered evidence indicating that Williams was paid more than Mundt until a month before her termination. According to West Group, the wage differential was based on a raise which was granted based on a merit system, in particular, performance evaluations. Williams has not contested this explanation. The Court therefore finds that West Group has supplied a bona fide reason for the pay differential between Williams and Mundt. See id. As such, the Court grants summary judgment on Williams' EPA claim.

**IV. Count Nine: Fair Labor Standards Act**

Williams alleges that she was, "frequently scheduled and required to work six (6) days a weak in addition to uncompensated time to complete various projects and work on behalf of the Defendant…" in violation of 29 U.S.C. §201 et. seq. (Am. Comp. ¶75) See also, Williams Dep. at 54). Under the Act, certain employees are exempt from overtime wage requirements, among them, "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. §213(a)(1). West Group has presented evidence that Williams was a professional exempt employee. (Blank Aff. ¶3). Williams does not respond to West's explanation with additional evidence and her deposition testimony indicates that she was unaware of her employee classification. (Williams Dep. at 364-65). Therefore, summary judgment is appropriate on Williams' FLSA claim.

**V. Count Four: Breach of Employment Contract**

Plaintiff alleges that West Group's handbook, specifically its open door policy, created a contract between herself and West Group. Williams argues that West Group was in breach of contract by "refusing to provide direct access [sic] Defendant's senior management pursuant to the corporate grievance policy as outlined in the employee handbook." (Am. Compl. ¶47). Williams bases her claim on the fact that she did not receive a response to her complaints from the "chief ranking officer of the company." (Williams Dep. at 333-334, 336-337). The handbook's open door policy states in relevant part:

> The Open Door Policy is deeply ingrained in West's history, and is base on respect for the individual. Every West employee has the right to appeal the actions of his or her immediate supervisor if that action directly affects the employee's work environment or job status.
> If you have a problem you believe the company can help solve, discuss it with your immediate supervisor or department manager. If the matter is not resolved at that level, you have the right to appeal to the next highest manager, and all the way to the president if you wish. What is most important is that you bring your problem up for discussions as quickly as possible. West encourages employees to discuss their problems honestly and in confidence. The Open Door Policy is designed to assist you in doing this.

(Ellingstad Aff., Ex. 60).

An employee handbook which explicitly states that it does not create contractual rights, may serve as "a valid expression of [the employer's] intention." See Michaelson v. Minnesota Mining and Mfg. Co. 474, N.W.2d 174, 180 (Minn. Ct. App. 1991), aff'd, 479 N.W.2d 58 (Minn. 1992). West Group argues that its handbook expressly disclaims any intent to create contractual rights (Def.'s Mem. Supp. Summ. J. at 23). However, they do not cite the record to

that effect. Therefore, the Court considers the language of the handbook in determining whether a contract was created between West Group and Williams.

The Minnesota Supreme Court considered a similar issue in Hunt v. IBM Mid Am. Employees Fed. Credit Union, 384 N.W.2d 853, 856 (Minn. 1986). As in this instance, the plaintiff relied solely on the language of the employee handbook in arguing that it created a contractual relationship between the plaintiff and the employer. Id. The Court held that "where, as here, the intent of the parties is totally ascertainable from the writing, construction is for the court." Id. at 856 (citing Donnay v. Bolware, 275 Minn. 37, 44, 144 N.W.2d 711, 716 (1966). The Court found that the handbook language providing that an employee who was reprimanded would "be placed on probation," prior to termination was not sufficiently specific to require the employer to place an employee on probation prior to terminating him. Id. at 856-857.

The Court finds that West Group's open door policy's terminology consists of general policy statements, similar to those in the handbook discussed in Hanes. See id., 384 N.W.2d at 855. "It is for the court to determine as a matter of law whether these types of general policy statements... rise to the level of meeting contractual requirements for an offer." Id. at 859. Here the Court finds that West Group's open door policy is not sufficiently definite to constitute an offer for a unilateral contract. As such, Williams' breach of contract claim fails as a matter of law and is therefore dismissed.

**VI. Count Twelve: Family and Medical Leave Act**

In the Amended Complaint, Williams alleges that the West Group and the individual defendants, "unlawfully interfered with, restrained, and denied Plaintiff's exercise of her rights

under the FMLA and Plaintiff's attempt to exercise her rights under the FMLA by denying her leave, by terminating her, and by the other actions set forth above." (Am. Compl. ¶ 97).

The FMLA provides that an eligible employee may take up to twelve weeks of unpaid leave within a twelve-month period for a serious health condition. 29 U.S.C. §2614(a)(1). The FMLA prohibits employers from interfering with, restraining, or denying the existence of or the attempt to exercise any rights provided under the statute. 29 U.S.C. §2615(a)(1). An employee must notify his employer of his "intention to take leave" in order to invoke FMLA protections. 29 U.S.C. §2612(e)(2)(B).

West Group argues that Plaintiff's claim under the FMLA fails because she never requested leave and thus was never denied leave, as she admits in her deposition testimony. (Williams Dep. at 390- 396). An employee must first indicate that she has a need for a leave and what the reason for the leave is. See 29 C.F.R. §825.302(c).

The Court finds that Williams has not set forth evidence on the record to create a genuine issue of material fact as to whether she was denied leave under the FMLA. In fact, the record indicates that Williams never requested a leave. Rather, in response to a deposition inquiry regarding whether she requested leave, Williams responded that she was "on the road" to requesting leave and that West Group should have discussed FMLA leave with her. (Williams Dep. at 396). Her deposition testimony states, "When I was unable to work within [West Group's] definition and according to their demands, then we should have been having a discussion about all forms of leave that I would have been entitled to under law, which would have included the FMLA. (Williams Dep. at 391).

Given William's affirmative duty to request some kind of leave and her deposition testimony indicating that she did not in fact request leave, the Court finds that William's FMLA claim does not survive summary judgment. Therefore, Count Twelve is dismissed.

## VII. Count Sixteen: Federal Retaliation Claims; Count Seventeen: Minnesota's Whistleblower Act.

In Count Sixteen of her Amended Complaint, Williams argues that due to her "opposition to Defendant's policy and practice of discriminating against people of color regardless of race or national origin as well as religious orientation," West Group retaliated against her in violation of Title VII and the ADA. (Am. Comp. at ¶116). As the Court has already determined that William's claims under Title VII and the ADA are time-barred, Williams' federal retaliation claim is likewise dismissed.

In Count Seventeen of the Amended Complaint, Williams argues that she was terminated, at least in part, due to her complaints regarding what she believed were incidents in which she would be required to give consultation or advice regarding law in jurisdictions where she was not licensed, in violation of Minnesota's Whistleblower statute, Minn. Stat. §181.932, Subd.1 (2000). (Am. Compl. ¶121; Williams Dep. at 262, 426)).

In order to establish a prima facie case under the Minnesota Whistleblower's Act, Williams must show that (1) she engaged in statutorily-protected conduct; (2) the employer took adverse action against her; and (3) there was a causal connection between the protected activity and the adverse action. Bersch v. Rgnonti & Assocs., Inc., 584 N.W.2d 783, 786 (Minn. App. 1998), rev. denied (Minn. Dec. 15, 1998).

The record indicates that Williams first complained that West required reference attorneys to engage in the unauthorized practice of law in 1994. (Ellingstad Aff., Ex. 7). Further, due to her complaints, West Group retained two law firms to issue opinions in 1996 and 1997. (Id., Ex. 51).

Here, Williams' claim that she was terminated due to her status as a "whistle-blower" fails because she is unable to demonstrate a causal connection between her termination and her "unlawful practice of law" accusations against West Group. See Petrovic v. Ridgeview Country Club, 2002 WL 765490 *4 (Minn. App. 2002). In particular, the complaints about the unlawful practice of law occurred from the beginning of her employment in 1994. As such, the distance in time from the Williams complaints and her eventual termination in 1998, do not suggest a connection. See Kipp v. Missouri Highway and Transp. Comm'n 280 F. 39 893, 897 (8th Cir. 2002)(holding that a two month time period between the plaintiff's discrimination complaint and her termination "so dilutes any inference of causation that we are contained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's favor] on the matter of causal link"). Therefore, summary judgment is granted on Williams' claim under Minn. Stat. §181.932, Subd. 1 (2000).

**VIII. Count Nineteen: Trespass**

Williams alleges a claim of trespass against Jeanine Bieter for taking an office cart containing boxes with Plaintiff's belongings into her office and checking that no West property was in them before Plaintiff left West following her termination.

A person commits trespass by unlawfully entering another's property without consent. Special Force Ministries v. WCCO Television, 584 N.W.2d 789, 792 (Minn. Ct.App. 1998). A

plaintiff must prove "a rightful possession in the plaintiff and the unlawful entry upon such possession by the defendant." Id. at 792-93. Proof of damages is also essential to a trespass claim. See Hermann v. Fossum, 270 N.W.2d 18, 20-21 (Minn. 1978).

The Court concludes that Williams' trespass claim fails. In her complaint she alleges that she suffered damages as a result of the trespass. (Am. Compl. ¶130). Williams, however, has not presented any evidence on the record suggesting that she has suffered damages. Rather, her memorandum in opposition to summary judgment merely states that she suffered injury to her nails. (Pl.'s Mem. Opp. Summ. J. at 19). The Court finds that Williams has therefore presented insufficient evidence from which a rational jury could be expected to find a connection between the alleged trespass and her unsupported claim of damages. Accordingly, summary judgment is granted on Williams' trespass claim.

Based on the records, filings and proceedings herein, and for the reasons stated above, IT IS HEREBY ORDERED THAT:

1.) Defendants' Motion for Summary Judgment (Docket No. 52) is GRANTED .

Date: March 21, 2003

Michael J. Davis
United States District Court

# UNITED STATES DISTRICT COURT
## District of Minnesota

700 Federal Building
316 North Robert Street
St. Paul, MN 55101

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

417 Federal Building
515 West First Street
Duluth, MN 55802

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.